**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1190

BRICKSTREET MUTUAL INSURANCE COMPANY,

Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; PARAMONT COAL COMPANY, LLC; MARK A. VANDYKE,

Respondents.

On Petition for Review of an Order of the Benefits Review Board. (17-0084-BLA)

Argued: January 31, 2019                                  Decided: April 24, 2019

Before GREGORY, Chief Judge, and THACKER and HARRIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** William S. Mattingly, JACKSON KELLY, PLLC, Lexington, Kentucky, for Petitioner. Ann Marie Scarpino, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C.; Brad Anthony Austin, WOLFE, WILLIAMS & REYNOLDS, Norton, Virginia, for Respondents. **ON BRIEF:** Kate O'Scannlain, Solicitor of Labor, Maia S. Fisher, Associate Solicitor, Sean G. Bajkowski, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director, Office of Workers' Compensation Programs. Timothy W. Gresham, Kendra R. Prince, PENN, STUART & ESKRIDGE, Abingdon, Virginia, for Respondent Paramont Coal

Company Virginia, LLC.  Joseph E. Wolfe, Victoria S. Herman, WOLFE WILLIAMS &
REYNOLDS, Norton, Virginia, for Respondent Mark A. Vandyke.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This is a petition for review from a decision of the Benefits Review Board (the "BRB") affirming the Administrative Law Judge's (the "ALJ") award of benefits to Mark VanDyke ("Claimant") under the Black Lung Benefits Act (the "Act"), 30 U.S.C. § 901, *et seq.* Petitioner BrickStreet Insurance Company ("BrickStreet") argues that the ALJ's decision was contrary to law and unsupported by substantial evidence. Specifically, BrickStreet argues that the ALJ erroneously reversed an evidentiary decision made after the close of a hearing and, as a result, found BrickStreet to be responsible for Claimant's benefits.

For the reasons stated below, we find the award of benefits legally proper and supported by substantial evidence. Therefore, we affirm.

I.

Claimant worked as a coal miner for nearly 32 years. For 20 of those years -- from 1992 until his resignation on December 14, 2012 -- Claimant worked for Paramont Coal Company ("Paramont"). On December 13, 2012, one day before Claimant's resignation, BrickStreet began to provide insurance coverage to Paramont.

A.

The Black Lung Benefits Act

To obtain benefits under the Act, an applicant must establish that: (1) "he has pneumoconiosis, in either its clinical or legal form"; (2) "the pneumoconiosis arose out of coal mine employment"; (3) "he is totally disabled by a pulmonary or respiratory impairment"; and (4) "his pneumoconiosis is a substantially contributing cause of his

3

total disability." *W. Va. CWP Fund v. Bender*, 782 F.3d 129, 133 (4th Cir. 2015) (internal quotation marks omitted). "[T]he existence and causes of pneumoconiosis are difficult to determine, and Congress accordingly has established a number of evidentiary presumptions to assist miners in proving their claims." *Hobet Mining, LLC v. Epling*, 783 F.3d 498, 501 (4th Cir. 2015) (internal quotation marks omitted).

1.

*Pneumoconiosis*

The Act grants monthly payments and medical benefits to individuals who have black lung disease, also known as pneumoconiosis. *See* 30 U.S.C. § 901(a). Pneumoconiosis is "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 20 C.F.R. § 718.201(a). "For purposes of this definition, 'pneumoconiosis' is recognized as a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure." *Id.* § 718.201(c).

2.

*Irrebuttable Presumption*

Relevant here, the Act allows for an irrebuttable presumption that a miner is totally disabled due to pneumoconiosis if, in relevant part, an x-ray of the miner's lungs shows "one or more large opacities (greater than one centimeter in diameter)" which "would be classified in category A, B, or C in the International Classification of Radiographs of the Pneumoconioses by the International Labor Organization." 30 U.S.C. § 921(c)(3). "The condition described by these criteria is frequently referred to as

4

complicated pneumoconiosis, although that term does not appear in the [Act]." *E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs*, 220 F.3d 250, 255 (4th Cir. 2000).

This irrebuttable presumption is relevant to a determination of when benefits become due, as "[b]enefits are payable to a miner who is entitled beginning with the month of onset of total disability due to pneumoconiosis arising out of coal mine employment." 20 C.F.R. § 725.503(b). And, unlike in the case of simple pneumoconiosis,[1] "[l]iability is established as of the date of determination of complicated pneumoconiosis." *Swanson v. R.G. Johnson*, 15 Black Lung Rep. (Juris) 1–49 (Ben. Rev. Bd. 1991). "The liability based upon the irrebuttable presumption fell upon the operator as of [the date of determination of complicated pneumoconiosis] and the obligations of the operator are to be discharged by the carrier as of that date." *Id.*

3.

*Liable Operator*

The Act places liability for a claimant's benefits upon the responsible coal mine operator. An operator is "any owner, lessee, or other person who operates, controls, or supervises a coal . . . mine." 30 U.S.C. § 802(d). "[L]iability for [black lung] benefits falls to the mine operator that most recently employed the miner for at least a year, so long as that employer is financially capable of assuming liability for the claim." *RB&F*

---

[1] In the case of simple pneumoconiosis, "the responsible insurance carrier is the carrier on the risk at the time of the claimant's last exposure to coal mine dust." *Swanson*, 15 Black Lung Rep. (Juris) 1–49, at *1.

5

*Coal, Inc. v. Mullins*, 842 F.3d 279, 282 (4th Cir. 2016). An operator is "capable of assuming liability for the payment of continuing benefits" if "[t]he operator obtained a policy or contract of insurance . . . that covers the claim." 20 C.F.R. § 725.494(e)(1).

4.

*Adjudication of Black Lung Claims*

Black lung entitlement claims are adjudicated in three stages.

a.

First, a claimant files a claim with a District Director in the Department of Labor ("DOL") Division of Coal Mine Workers' Compensation (the "District Director"). *See* 20 C.F.R. § 725.350(b). The District Director is "a person . . . who is authorized to develop and adjudicate claims." 20 C.F.R. § 725.101(a)(16). The District Director (or a claims examiner, on the District Director's behalf) investigates the claim, accepts entitlement and liability evidence from the parties, and then determines if the claimant is entitled to benefits and, if so, who is the presumptively responsible operator. *See id.* § 725.401. The District Director is an "adjudication officer" who is "authorized to perform functions with respect to the development, processing, and adjudication of claims" under the Act. *See id.* § 725.350(a)–(b). In contrast, the Director of the Office of Workers' Compensation Programs (the "Director") is "a party to [a] claim" under the Act and is authorized to "participate at any stage in the adjudication of a claim for benefits" pursuant to the Act. *See id.* § 725.360(a)(5).

The parties are required to submit all evidence relevant to liability at this stage, so that the District Director can reliably identify the responsible operator. *See* Regulations

Implementing the Federal Coal Mine Health and Safety Act of 1969, as amended, 65 Fed. Reg. 79920, 79976 (Dec. 20, 2000) ("[T]he evidentiary limitations of §§ 725.408 and 725.414 are designed to provide the district director with all of the documentary evidence relevant to the determination of the responsible operator liable for the payment of benefits."). And the regulations implementing the Act expressly recognize that evidence relating to liability is generally "within the control of the operator notified by the district director or . . . in the control of a party with whom [an] insurer has contracted to provide necessary coverage" and, thus, can be provided within the 90 days allotted in section 725.408(b)(1) for the submission of documentary evidence in support of the party's position on liability. *Id.* And, "[i]f the operator or insurer is unable to locate the evidence within that period, it should seek an extension from the district director." *Id.* But, if a "responsible operator" -- typically the claimant's last employer -- cannot be identified, then the claim is paid out of the Black Lung Disability Trust Fund. *See* 30 U.S.C. §§ 932, 934.

Once the parties have completed their submissions of liability evidence and the District Director has "complete[d] the development of medical evidence under § 725.405 of this part, including the complete pulmonary evaluation authorized by § 725.406," he shall issue a Schedule for the Submission of Additional Evidence (the "Schedule"). 20 C.F.R. § 725.410(a). The "Additional Evidence" includes "evidence relevant to the claimant's eligibility for benefits and evidence relevant to the liability of the designated responsible operator." *Id.* § 725.410(b). "The schedule shall allow all parties not less than 60 days within which to submit additional evidence . . . and shall provide not less

7

than an additional 30 days within which the parties may respond to evidence submitted by other parties." *Id.* The Schedule must also contain "a summary of the complete pulmonary evaluation," "the district director's preliminary analysis of the medical evidence," and "the district director's designation of a responsible operator liable for the payment of benefits." *Id.* § 725.410(a)(1)–(3).

b.

After the District Director issues his determination, any party may appeal and request a formal hearing on the matter before the Office of Administrative Law Judges ("OALJ"). *See* 20 C.F.R. § 725.421(a). The regulations expressly contemplate that the ALJ will not allow evidence pertaining to liability into the record that was not submitted to the District Director, absent extraordinary circumstances. *See id.* § 725.456(b)(1) ("Documentary evidence pertaining to the liability of a potentially liable operator . . . which was not submitted to the district director shall not be admitted into the hearing record in the absence of extraordinary circumstances."); *id.* § 725.457(c)(1) ("In the case of a witness offering testimony relevant to the liability of the responsible operator, in the absence of extraordinary circumstances, the witness must have been identified as a potential hearing witness while the claim was pending before the district director."); *id.* § 725.414(c) ("In accordance with the schedule issued by the district director, all parties must notify the district director of the name and current address of any potential witness whose testimony pertains to the liability of . . . the designated responsible operator. Absent such notice, the testimony of a witness relevant to the liability . . . will not be

8

admitted in any hearing conducted with respect to the claim unless the [ALJ] finds that the lack of notice should be excused due to extraordinary circumstances.").

c.

Once the ALJ has ruled on the appeal, any party may appeal the decision to the BRB. *See* 20 C.F.R. § 725.481. The BRB "is not empowered to engage in a de novo proceeding or unrestricted review of a case brought before it." *Id.* § 802.301(a). Rather, the BRB is only "authorized to review the findings of fact and conclusions of law on which the decision or order appealed from was based." *Id.* Consequently, parties may not simply present new arguments to the BRB on appeal. And, further, the parties are not permitted to submit new evidence to the BRB, and "[a]ny evidence submitted by a party which is not part of the record developed at the hearing before the [ALJ] will be returned without being considered by the [BRB]." *Id.* § 802.301(b).

B.

Claimant's Application for Benefits

On January 29, 2013, Claimant filed an application for benefits under the Act. Specifically, Claimant alleged that, after working in coal mines for over three decades, he began to have trouble breathing and was no longer able to work in the mines. Claimant listed Paramont as his most recent employer. Claimant based his claim for benefits (the "Claim") on these basic facts.

To establish eligibility under the Act, Claimant was required to demonstrate that he was totally disabled due to pneumoconiosis in connection to his coal mine employment. *See* 30 U.S.C. §§ 901, 921. As noted, the Act provides a statutory

9

presumption of total disability resulting from pneumoconiosis if the applicant suffers from "a chronic dust disease of the lung which . . . when diagnosed by chest [x-ray], yields one or more large opacities (greater than one centimeter in diameter) [that] would be classified in Category A, B, or C in the International Classification of Radiographs of the Pneumoconioses." *Id.* § 921(c)(3).

## C.

### Evidence Supporting the Claim

In support of his Claim, Claimant submitted medical evidence corroborating the existence of legal pneumoconiosis, including several x-ray interpretations and records of treatment from a pulmonologist who treated Claimant for coal workers' pneumoconiosis and chronic obstructive pulmonary disease on January 4, 2013.

Claimant attached a note written on December 19, 2012 (the "2012 note") by Dr. W. Eric Shrader. Dr. Shrader, Claimant's family physician since 2005, stated, "[Claimant] has advanced coal worker's [sic] pneumoconiosis with interstitial fibrosis. He cannot be exposed to respirable dust and is disabled from his pulmonary disease." J.A. 34.[2] Claimant also submitted an x-ray dated January 15, 2013. This x-ray was examined by Dr. Kathleen DePonte, a board certified B reader[3] and radiologist, on

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties to this appeal.

[3] "Certified B Reader means that the physician has demonstrated ongoing proficiency in evaluating chest radiographs for radiographic quality and in the use of the [International Labor Organization] classification for interpreting chest radiographs for pneumoconiosis and other diseases by taking and passing a specially designed (Continued)

February 24, 2013. Dr. DePonte concluded the x-ray reflected the presence of coal workers' pneumoconiosis. As part of the DOL's complete pulmonary evaluation, Claimant had another chest x-ray on June 15, 2013. Dr. DePonte also interpreted these x-rays as positive for pneumoconiosis. Specifically, Dr. DePonte found the x-rays reflected "[t]ypical findings of complicated coal workers' pneumoconiosis." J.A. 21. These x-rays were reviewed by Dr. Peter J. Barrett -- also a board certified B reader -- who agreed with Dr. DePonte's conclusions.

In June 2013, Dr. James Gallai, a board certified pulmonologist, conducted an examination of Claimant. Dr. Gallai performed breathing tests and resting arterial blood gas studies that indicated the existence of severe respiratory issues. Based on the results of Claimant's tests as well as Dr. DePonte's interpretation of Claimant's x-rays, Dr. Gallai submitted a Black Lung Evaluation report to the DOL's Office of Worker Compensation Programs, in which he diagnosed Claimant with both clinical and legal pneumoconiosis.

D.

Notice of Claim

On January 19, 2013, a DOL claims examiner issued a Notice of Claim (the "Notice") to Paramont that identified Paramont as the potentially liable operator for the

---

proficiency examination . . . ." 20 C.F.R. § 718.102(e)(2)(iii). The International Labor Organization classification is an accepted, uniform framework for classifying radiographs, originally created by the United Nations' International Labour Organization.

Claim and identified Paramont as self-insured.  Thereafter, Paramont notified the District Director that BrickStreet was its insurer, effective December 13, 2012.  Consequently, on February 20, 2013, the District Director corrected and reissued the Notice to list Paramont as the potentially liable operator and BrickStreet as the insurance carrier.

The Notice provides, in relevant part:

> Within 30 days of receipt of this Notice of Claim, you (*or your insurer*) must file a response pursuant to 20 C.F.R. [§] 725.408 indicating your intent to accept or contest your identification as a potentially liable operator.
>
> . . .
>
> Accepting liability means only that you are the operator liable for the payment of any benefits due; it does not constitute a stipulation or admission that the claimant is entitled to benefits.
>
> . . .
>
> Absent extraordinary circumstances, no documentary evidence relevant to the assertions set forth in 20 C.F.R. [§] 725.408(a)(2) . . . may be admitted in any further proceedings unless it is submitted within 90 days of your receipt of this notice or an extended period authorized by the District Director.
>
> If you do not respond within 30 days of your receipt of this Notice of Claim, *you will not be allowed to contest your liability for payment of benefits* on any of the grounds set forth in 20 C.F.R. [§] 725.408(a)(2).

J.A. 44–45 (emphases supplied).  On April 29, 2013, Paramont responded to the Notice and admitted that it "should remain on notice as a potentially liable operator."  *Id.* at 50.  Although BrickStreet was also allotted 30 days to respond as the insurer of the potentially liable operator, BrickStreet failed to respond.

12

## E.

### Schedule for Submission of Additional Evidence

On August 20, 2013, after the District Director received the initial medical evidence from Claimant, the District Director issued the Schedule to all parties. The Schedule indicated (1) Claimant was preliminarily entitled to benefits; (2) Paramont was preliminarily the responsible operator liable for the payment of benefits; and (3) BrickStreet was preliminarily Paramont's insurer. Further, the Schedule expressly provided that the parties were not required to "submit any additional medical evidence on entitlement" at the current stage of the proceedings, but may submit documentary evidence and identify witnesses relevant to liability that the designated responsible operator would call if the case was referred to the OALJ. J.A. 53.

Of note, the Schedule also provided, "[a]bsent a showing of extraordinary circumstances, no documentary evidence relevant to liability, or testimony of a witness not identified at this stage of the proceedings, may be admitted into the record once a case is referred to the [OALJ]." J.A. 53. Finally, the Schedule expressly stated, "[a]ny party that wishes to submit liability evidence or identify liability witnesses [in support of the party's position], *must mail that evidence or identification to this office*" before October 19, 2013. *See id.* (emphasis supplied).

Attached to the Schedule was a copy of the evidence and a summary of the evidence supporting the Claim. This attachment included the date of Claimant's final day of work, as well as the contents and date of Dr. Shrader's 2012 note. In addition to the details of the Claim, the summary expressly recognized BrickStreet as the potentially

13

liable carrier. *See* J.A. 58 ("the potentially liable operator/carrier, Brickstreet Mutual Ins [sic] Company"). Finally, the Schedule noted BrickStreet had received the notice of claim, based on a signed postal return, but had "failed to timely submit evidence to support its position or to timely request an extension of the period of time for submission of such evidence." *Id.* Yet, again, BrickStreet did not reply.

F.

Proposed Decision and Order

On December 30, 2013, after consideration of the parties' evidence and submissions, the District Director issued its Proposed Decision and Order (the "Proposed Decision"), in which it found Claimant to be entitled to benefits under the Act. In the Proposed Decision, the District Director summarized its entitlement analysis.

First, the District Director reviewed the medical evidence that supported a finding of complicated pneumoconiosis. Specifically, the District Director found that the presence of pneumoconiosis was established by Dr. DePonte's interpretation of the January 15, 2013 x-ray and was corroborated by the results of Dr. Gallai's tests. Thus, the District Director found that complicated pneumoconiosis was established by both a "reasoned medical opinion" and "by complicated x-ray" and that the irrebuttable presumption of total disability was successfully invoked. J.A. 76.

Next, the District Director summarized the evidence related to Claimant's employment and analyzed the matter of liability. As to this, the District Director observed that Paramont was Claimant's last employer and was capable of paying benefits for Claimant's claim by virtue of its insurance through BrickStreet. Accordingly, the

14

District Director concluded that Paramont was the responsible operator and that BrickStreet was the responsible carrier.

The District Director also concluded that Claimant suffered from complicated pneumoconiosis and was thus entitled to receive benefits under the Act beginning in January of 2013, the date of the first x-ray establishing complicated pneumoconiosis. The order included a proposed agreement to pay the determined benefits, to be signed by BrickStreet or Paramont. Instead of signing the proposed agreement, on January 7, 2014, Paramont requested a formal hearing before an ALJ. And, again, BrickStreet did not file a response.

G.

BrickStreet's First Response

While the case was pending assignment to an ALJ, on April 24, 2014, BrickStreet wrote a letter to the DOL claims examiner. In the letter, BrickStreet sought dismissal as the named insurer and opined that Paramont's "insurer prior to December 13, 20[12] should now be put on notice of the presence of complicated pneumoconiosis which arose during their period of insurance" because Claimant's "lesions appear to have arisen prior to Brickstreet's coverage [of Paramont], [and thus] BrickStreet cannot be named as the proper insurer in this matter." J.A. 102. The sole evidentiary basis for the letter was Dr. DePonte's 2013 evaluation of Claimant's chest x-ray.

15

## H.

### Dr. Shrader's Deposition

On March 26, 2015, BrickStreet deposed Dr. Shrader, with Claimant's counsel in attendance. Dr. Shrader's deposition focused largely on the 2012 note. Dr. Shrader testified that he had diagnosed pneumoconiosis based, in part, on a 2007 chest x-ray report. Dr. Shrader testified that the chest x-ray report identified "large central hilar adenopathy [and] extensive diffuse reticulonodular interstitial opacities, which have increased." J.A. 95. He further opined that the lesions in Claimant's lungs -- as depicted in the January 2013 x-ray -- could not have developed overnight and, thus, would likely have been present in Claimant's lungs by at least October or November of 2012 -- a month before Claimant left Paramont's employ. *Id.* at 97.

A year after Dr. Shrader's deposition, on March 25, 2016, BrickStreet wrote a letter to the ALJ stating *for the first time* that Dr. Shrader's deposition would be offered into evidence during a hearing before the ALJ.

## I.

### BrickStreet Identifies Dr. Shrader

As noted, on January 7, 2014, Paramont requested a hearing before an ALJ and, on February 27, 2014, the matter was formally referred to the OALJ for a formal hearing. But the matter was not assigned to an ALJ until October 23, 2015. On April 20, 2016, counsel for Claimant and BrickStreet appeared before the ALJ for a hearing. No representative for the Director of the Office of Workers' Compensation, a party to the claim, was in attendance.

16

At the hearing, BrickStreet did not dispute Claimant's eligibility for benefits. Rather, BrickStreet disputed liability. Specifically, BrickStreet argued that it could not be liable for benefits because Claimant's pneumoconiosis -- a progressive disease -- must have developed well before it was first identified in 2012, and BrickStreet had only insured Claimant for a week prior to his diagnosis by Dr. Shrader. In support of this argument, BrickStreet offered Dr. Shrader's deposition. Without objection from Claimant's attorney, Dr. Shrader's deposition was admitted into evidence.

Thereafter, on July 22, 2016, the Director submitted a brief seeking exclusion of the previously admitted deposition of Dr. Shrader. The Director argued that Dr. Shrader's deposition was untimely disclosed liability evidence because BrickStreet had not identified Dr. Shrader as a potential liability witness nor submitted his deposition testimony as liability evidence before the District Director. This evidence, the Director argued, "constitute[d] evidence bearing on the responsible carrier issue and therefore should have been produced only at the district director level, absent extraordinary circumstances." J.A. 138–39. The ALJ ordered briefing on the issue.

Despite the Director's argument that Dr. Shrader's deposition should not have been admitted without a showing of extraordinary circumstances, in its August 8, 2016 response to the Director's brief, BrickStreet did not argue that there were extraordinary circumstances justifying its late submission of liability evidence. Rather, BrickStreet

17

relied solely on the argument "that Dr. Shrader had already been identified as a witness[4] and his note was included as evidence before the District Director [and BrickStreet] object[ed] to the Director's argument that physician testimony may only be used to establish entitlement and not liability of a carrier." J.A. 139.

## J.

### Award of Benefits

On October 20, 2016, the ALJ issued a decision awarding benefits to Claimant and identifying BrickStreet as the responsible carrier. In doing so, the ALJ concluded that BrickStreet could not rely on Dr. Shrader's testimony, because his testimony was subject to the same limitations as any other liability evidence and witnesses. *See* J.A. 140 (concluding BrickStreet's delay in contesting the carrier liability issue "prevented full development of the issue at the District Director level" and "[a]ny additional evidence exploring the basis for [Dr. Shrader's 2012 diagnosis] . . . should have been submitted while the claim was pending before the District Director"). And, as with other liability evidence, Dr. Shrader's deposition testimony was required to be disclosed to the District Director, which it was not. Therefore, the ALJ ruled that the deposition testimony was properly excluded.

---

[4] Specifically, BrickStreet asserted "Dr. Shrader was already identified as a witness because Dr. Shrader's December 19, 2012 note diagnosing advanced coal worker's pneumoconiosis was designated as Director's Exhibit 18, and had been relied upon by the district director in finding that the evidence established the existence of complicated pneumoconiosis." J.A. 150.

Based upon the remaining admissible record evidence, the ALJ determined that the earliest onset date of Claimant's complicated pneumoconiosis was January 15, 2013, a month *after* BrickStreet assumed coverage of Paramont. Accordingly, the ALJ concluded that BrickStreet was the responsible carrier and was required to pay benefits to Claimant beginning on January 15, 2013.

## K.

### Appeal to the BRB

BrickStreet unsuccessfully appealed the ALJ's decision to the BRB.

Before the BRB, as to its failure to identify Dr. Shrader as a liability witness before the District Director, BrickStreet argued that the Black Lung regulations were unclear with regard to the disclosure obligations of carriers. Specifically, BrickStreet argued, "neither the Notice of Claim nor the [Schedule] required an affirmative response from carrier regarding its liability . . . [but] only required such a response from operators." J.A. 151.

Alternatively, BrickStreet argued that it had complied with the regulations for two reasons. First, BrickStreet argued that Dr. Shrader had already been identified as a witness before the District Director, because the 2012 note was included in the record before the District Director. Second, BrickStreet argued that the District Director had considered the 2012 note.

19

1.

*Carrier's Obligations*

As to BrickStreet's first argument, the BRB observed that, in the Fourth Circuit, an insurance carrier is obligated to assume the role of the operator during the claims process and must comply with the operator's statutory and regulatory obligations. Thus, even if BrickStreet was correct in its argument that the regulations were unclear as to carriers, BrickStreet was nonetheless required to discharge the clear obligations of the operator. *See* J.A. 151 (finding BrickStreet's arguments about its obligations "without merit" because the "rules and regulations regarding liability evidence apply to carriers as well as to operators" and the insurance carrier is required to discharge the responsibilities of the operator). The BRB found that the District Director's Schedule clearly imposed disclosure obligations on BrickStreet, but BrickStreet failed to comply with the disclosure obligations.

2.

*Identification of Dr. Shrader*

As to BrickStreet's alternative arguments, the BRB determined that Dr. Shrader's deposition testimony was not submitted as liability evidence nor was Dr. Shrader identified as a liability witness before the District Director. Specifically, the BRB stated that the inclusion of Dr. Shrader's 2012 note in the record was not the equivalent of identifying Dr. Shrader as a liability witness. The BRB further determined that, contrary to BrickStreet's contention, Dr. Shrader's 2012 note was not relied upon by the District Director to find complicated pneumoconiosis.

20

Finally, the BRB found that the ALJ had correctly determined that Dr. Shrader's deposition, if admitted, was insufficient to establish complicated pneumoconiosis prior to the effective date of BrickStreet's coverage. The BRB approved of the ALJ's observation that "Dr. Shrader did not indicate that the x-ray specifically showed complicated pneumoconiosis, and the x-ray interpretation itself is not contained in the record." J.A. 154. Based on these deficiencies, the BRB determined, "the [ALJ] permissibly found that [Dr. Shrader's] opinion is not sufficiently documented to establish the date of onset of the disease." *Id.* Because the BRB approved of this alternative finding, BrickStreet had failed to demonstrate "how the procedural errors it alleges made any difference." *Id.* at 155.

Accordingly, the BRB affirmed the ALJ's decision. This appeal followed.

## II.

"In black lung cases, our review of the B[RB]'s order is limited." *Harman Mining Co. v. Dir., Office of Workers' Comp. Programs*, 678 F.3d 305, 310 (4th Cir. 2012) (internal quotation marks omitted). Where an ALJ's decision has been affirmed by the BRB, we review the ALJ's decision "to determine whether it is in accordance with the law and supported by substantial evidence." *E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs*, 805 F.3d 502, 510 (4th Cir. 2015). In doing so, we confine our review to the grounds relied upon by the BRB. *See id.*

"As long as substantial evidence supports an ALJ's findings, we must sustain the ALJ's decision, even if we disagree with it." *Westmoreland Coal Co. v. Cochran*, 718 F.3d 319, 322 (4th Cir. 2013) (alteration and internal quotation marks omitted). We

21

review the BRB's conclusions of law de novo to determine whether they are rational and consistent with applicable law. *See E. Associated Coal*, 805 F.3d at 510. We review evidentiary decisions for abuse of discretion. *See Elm Grove Coal Co. v. Dir., Office of Workers' Comp. Programs*, 480 F.3d 278, 288 (4th Cir. 2007).

Finally, "[a]dministrative adjudications are subject to the same harmless error rule that generally applies to civil cases. Reversal on account of error is not automatic but requires a showing of prejudice." *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016). "The burden to demonstrate prejudicial error is on . . . the party challenging the agency action." *Id.*

### III.

BrickStreet presents a singular issue on appeal: whether the ALJ's determination that BrickStreet was the responsible insurance carrier is supported by substantial evidence and in accordance with law. BrickStreet raises several assignments of error.

First, as to the exclusion of Dr. Shrader as a witness, BrickStreet argues that the ALJ abused its discretion "by applying a far too restrictive interpretation of the agency regulat[ion] limiting liability evidence" when it excluded Dr. Shrader as an undisclosed liability witness. Pet'r's Br. 29. Further, BrickStreet argues that it sufficiently identified Dr. Shrader, and thus the ALJ erroneously excluded Dr. Shrader's testimony. Finally, BrickStreet argues that the ALJ erroneously deprived it of a meaningful and fair hearing by reversing its evidentiary decision admitting Dr. Schrader's testimony after the close of the hearing, on a post-hearing motion by the Director.

22

Next, BrickStreet asserts that the ALJ erred by failing to assess the evidence in order to determine whether the onset date of Claimant's complicated pneumoconiosis (and the accompanying irrebuttable presumption) was established prior to the effective date of BrickStreet's insurance coverage. In this regard, BrickStreet further argues that Dr. Shrader's deposition establishes that it is not the responsible carrier, because Dr. Shrader is "uncontradicted by this record [and] warrants determinative weight." Pet'r's Br. 36

We address each argument in turn.

### A.

### Evidentiary Ruling Excluding Dr. Shrader as a Witness

BrickStreet argues that the ALJ erroneously reversed an evidentiary decision when the ALJ excluded Dr. Shrader's deposition testimony as improperly disclosed. BrickStreet argues both that it was not required to identify Dr. Shrader before the District Director because Dr. Shrader is a medical (as opposed to liability) witness, and alternatively, that it sufficiently identified Dr. Shrader. BrickStreet further argues its right to a meaningful and fair hearing was violated by the ALJ's failure to provide sufficient notice and an opportunity to respond to the Director's post-hearing motion to exclude Dr. Shrader's testimony.

### 1.

### *Failure to Disclose Dr. Shrader as a Witness*

BrickStreet first argues that the ALJ erred by excluding Dr. Shrader's testimony as improperly disclosed, because it "was not required to identify Dr. Shrader as a medical

23

liability witness." Pet'r's Br. 29. Specifically, BrickStreet argues that Dr. Shrader was presenting medical evidence, as opposed to pure liability evidence, and thus BrickStreet was not required to disclose Dr. Shrader under the regulations governing disclosure of liability evidence. Rather, BrickStreet asserts, the Act's implementing regulations do not require medical witnesses -- even those pertaining to liability -- to be expressly designated before the District Director.

BrickStreet further argues that it provided sufficient notice, because Dr. Shrader was not a "previously unidentified witness." Pet'r's Br. 29. In support of this assertion, BrickStreet argues that Dr. Shrader had already been "identified" because the 2012 note was already in the record before the District Director, along with a notice of deposition and BrickStreet's letter indicating it wished to submit Dr. Shrader's deposition at the ALJ hearing.

Contrary to BrickStreet's assertions, the regulations implementing the Act clearly impose upon BrickStreet -- acting on behalf of its insured and as an independent party to the proceedings -- an obligation to comply with the Schedule issued by the District Director and to disclose potential liability witnesses:

> In accordance with the schedule issued by the district director, *all parties* must notify the district director of the *name and current address* of any potential witness whose testimony pertains to the liability of a potentially liable operator or the designated responsible operator. Absent such notice, the testimony of a witness *relevant to the liability* of a potentially liable operator or the designated responsible operator *will not be admitted in any hearing . . .* unless the [ALJ] finds that the lack of notice should be excused due to extraordinary circumstances.

24

20 C.F.R. § 725.414(c) (emphases supplied); *see also id.* § 725.360(a)(1)–(5) (parties to black lung benefits proceedings shall include the claimant, the Director, the coal mine operator, and "[a]ny insurance carrier of such operator"); *Tazco, Inc. v. Dir., Office of Workers' Comp. Programs*, 895 F.2d 949, 951 (4th Cir. 1990) (an insurance carrier is required to "take[] on all the employer's responsibilities in connection with insured claims" and "to discharge the *statutory and regulatory duties* imposed on the employer, thus stepping into its shoes" (emphasis supplied)). Yet, at no time before the District Director did BrickStreet give notice of Dr. Shrader as a potential liability witness, let alone notice of his "name and current address." 20 C.F.R. § 725.414(c).

Additionally, the District Director issued a Schedule that expressly designated BrickStreet as the preliminarily responsible carrier and noted that any party could submit liability evidence. The Schedule further dictated, "[a]bsent a showing of extraordinary circumstances, no documentary evidence relevant to liability, *or testimony of a witness not identified at this stage of the proceedings*, may be admitted into the record once a case is referred to the [OALJ]." J.A. 53 (emphasis supplied). Thus, even if BrickStreet correctly states that the implementing regulations of the Act do not address a situation in which medical evidence, previously undisclosed before the District Director, has bearing on liability, the Schedule -- which the regulations require compliance with -- clearly dictated submission of *all* evidence relevant to liability at the District Director stage, before the case was referred to the ALJ. BrickStreet chose to ignore the risks of untimely disclosure, and thus faced the consequences of exclusion.

25

At base, BrickStreet's arguments fail to address one basic principle: evidence and witnesses *pertaining to* liability *must* be disclosed before the District Director, absent extraordinary cause. *See* Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as amended, 65 Fed. Reg. 79920, 79976 (Dec. 20, 2000). And, despite being given an opportunity to respond to the Director's argument seeking exclusion of Dr. Shrader's deposition, BrickStreet neglected any attempt to establish extraordinary cause. *See* Oral Argument at 8:29–36, *BrickStreet Mutual Ins. v. Dir., Office of Workers' Comp. Programs*, No. 18-1190 (4th Cir. Jan. 31, 2019), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (hereinafter "Oral Argument") ("I didn't raise [extraordinary circumstances] when I saw it in the Director's brief. Maybe I should have but I thought that ruling had already been made").

As an initial matter, the ALJ is bound by regulations providing for the ordering, admission, and exclusion of certain kinds of evidence. *See, e.g.*, 20 C.F.R. §§ 725.456(b)(1), 725.457(c), 725.455(b). The ALJ is expressly not "bound by common law or statutory rules of evidence, or by technical or formal rules of procedure." *Id.* § 725.455(b) (further noting the ALJ "may entertain the objections of any party to evidence submitted under this section"). Once the matter is before the ALJ for a formal hearing, the regulations provide:

> No person *shall be permitted* to testify as a witness at the hearing, *or pursuant to deposition* or interrogatory under § 725.458, unless that person meets the requirements of § 725.414(c).
>
> (1)    In the case of a *witness offering testimony relevant to the liability* of the responsible operator, in the absence

26

of extraordinary circumstances, the witness must have been identified as a potential hearing witness while the claim was pending before the district director.

20 C.F.R. § 725.457(c)(1) (emphases supplied). While BrickStreet argues that the inclusion of the 2012 note in the record before the District Director, the notice of deposition, and the pre-hearing letter of intent to admit Dr. Shrader's deposition are sufficient to demonstrate notice, notice of an individual's *general identity* simply is not enough. Rather, the regulation specifically requires the individual be "identified *as a potential hearing witness*." *Id.* (emphasis supplied).

Further, while BrickStreet did provide notice of its intent to introduce Dr. Shrader's deposition testimony, it did not do so while the matter was before the District Director. The notice was not properly provided until shortly before a formal hearing in front of the ALJ. Therefore, it is clear that BrickStreet did not properly disclose or identify Dr. Shrader before the District Director, and thus the ALJ properly exercised its discretion and denied admission.

2.

*Opportunity for a Meaningful and Fair Hearing*

BrickStreet argues that the ALJ erred and, as a result, deprived BrickStreet of a meaningful, fair hearing when the ALJ admitted Dr. Shrader's deposition at a hearing and then, after the close of the hearing, excluded the deposition on a post-hearing motion by the Director. BrickStreet further asserts "[t]he process then failed to allow BrickStreet to try to establish extraordinary circumstances existed or offer other evidence such as the

27

testimony of [Claimant] to prove when complicated pneumoconiosis first arose." Pet'r's Br. 22.

a.

*Notice and Response*

BrickStreet asserts that the ALJ erroneously reversed its evidentiary ruling without providing sufficient notice and an opportunity to respond. The guiding case, on which BrickStreet relies, is *Preston v. Amherst Coal Company*, 24 Black Lung Rep. (Juris), 2008 WL 3860952 (Ben. Rev. Bd. 2008). There, the BRB held:

> Consistent with the principles of fairness and administrative efficiency that underlie the evidentiary limitations . . . if the [ALJ] determines that the evidentiary limitations preclude the consideration of proffered evidence, the [ALJ] should render his or her evidentiary rulings *before* issuing the Decision and Order. The parties should then have the opportunity to make good cause arguments . . . if necessary, or to otherwise resolve issues regarding the application of the evidentiary limitations that may affect the [ALJ's] consideration of the elements of entitlement in the Decision and Order.

*Id.* at *5 (emphasis supplied). Thus, under *Preston*, the ALJ should inform the parties of the evidentiary issue, give them an opportunity to respond, and issue the evidentiary ruling before issuing a decision on the merits of the case. *See id.*; *see also Mallette v. Arlington Cty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 640 (4th Cir. 1996).

Here, BrickStreet received notice that the Director was challenging the admissibility of Dr. Shrader's deposition via a post-hearing motion. The ALJ then ordered briefing on the issue. Indeed, BrickStreet filed a brief opposing the motion on August 8, 2016. Of particular note, BrickStreet's briefing on this issue did not make any

28

attempt to argue extraordinary circumstances in order to justify its failure to identify Dr. Shrader as a potential witness on liability before the District Director.

And, although the ALJ did give the parties an opportunity to brief the matter and argue extraordinary cause, the ALJ did not issue the evidentiary decision prior to the decision ruling on the merits of the Claim. Rather, in its decision awarding benefits, the ALJ considered the parties' arguments, found that Dr. Shrader's deposition was not properly disclosed, and concluded that, even if it did consider Dr. Shrader's deposition, the onset date of benefits was still after the effective date of BrickStreet's coverage.

Accordingly, contrary to BrickStreet's assertion, BrickStreet *was* given an opportunity to respond and *did* file a response, but *chose* not to argue extraordinary cause.[5] Moreover, BrickStreet conceded that it was prepared to argue extraordinary cause at the hearing but did not do so. *See* Oral Argument at 5:16–26 ("[Q:] But you said you were prepared to [argue extraordinary cause] at the hearing had they objected, so when they did object if you were prepared, why didn't you explain? [A:] In retrospect, maybe I should have."). By its own concession, then, BrickStreet was clearly aware that the admission of Dr. Shrader's testimony was likely to draw an objection from the Director as improperly disclosed and prepared for that eventuality, yet never presented its extraordinary cause argument, either before, during, or after the hearing.

---

[5] BrickStreet asserts, "[n]ot only was what appeared to have been a final ruling reversed, it was reversed without notice. The process then failed to allow BrickStreet to try to establish extraordinary circumstances existed." Pet'r's Br. 22. This is simply not factual.

29

b.

*Extraordinary Cause*

Regardless, any argument of extraordinary cause by BrickStreet would have been unavailing, because Dr. Shrader's testimony was not hidden or unavailable before the District Director. Rather, BrickStreet simply failed to participate in the proceedings until *sixteen months after* the Claim was filed, on April 24, 2014, when it filed an objection to being named the responsible carrier. Prior to April 24, 2014, BrickStreet had been identified as the potentially responsible insurance carrier or the responsible insurance carrier in the Amended Notice of Claim (issued February 20, 2013), the Schedule for Submission of Evidence (issued August 20, 2013), and the Proposed Decision and Order (issued December 30, 2013). And, BrickStreet was provided a summary of the medical evidence on August 20, 2013, by the District Director, including the exact contents of Dr. Shrader's 2012 note. As a result, it is not a leap to conclude that BrickStreet was well aware of a potential defense to liability while the case was pending before the District Director, yet failed to raise the issue for over a year.

c.

*Prejudice*

Even if BrickStreet could successfully argue that the ALJ failed to comply with *Preston*, it must also demonstrate that prejudice resulted from the error. "Administrative adjudications are subject to the same harmless error rule that generally applies to civil cases. Reversal on account of error is not automatic but requires a showing of prejudice." *See Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016). Further, "[t]he

30

burden to demonstrate prejudicial error is on . . . the party challenging the agency action."

*Id.*

BrickStreet cannot carry this burden, because as further detailed below, and as the ALJ noted and the BRB affirmed, Dr. Shrader's testimony would not impact the effective date of complicated pneumoconiosis. Therefore, no prejudice could have resulted from the exclusion of Dr. Shrader's testimony.

B.

Responsible Carrier Designation

The BRB affirmed the ALJ's determination that "the date of onset of complicated pneumoconiosis could not be established any earlier than January 15, 2013, the date of the first x-ray evidence of the disease." J.A. 154–55. BrickStreet argues that the ALJ failed to consider whether the onset date of Claimant's pneumoconiosis was prior to BrickStreet's effective coverage date and, as a result, erroneously designated BrickStreet as the responsible carrier.

1.

*Onset Date of Liability*

Liability for payment of benefits falls upon the "responsible operator," and the burden is on the designated responsible operator to prove "[t]hat it is not the potentially liable operator that most recently employed the miner." 20 C.F.R. § 725.495(c)(2). An employer is deemed the responsible operator if, in relevant part, "the miner's disability or death . . . [arose], at least in part, out of his employment with that operator . . . and the operator [is] capable of providing for the payment of benefits." *Armco, Inc. v. Martin*,

31

277 F.3d 468, 473 n.1 (4th Cir. 2002). An employer is capable of providing for the payment of benefits if it has an insurance policy covering the claim. *See id.* If these conditions are met, and the miner establishes his entitlement to benefits, then the responsible operator is liable for the benefits under the Act.

The question then is when liability is incurred. In complicated pneumoconiosis cases, "[l]iability is established *as of the date of determination* of complicated pneumoconiosis." *Swanson v. R.G. Johnson*, 15 Black Lung Rep. (Juris) 1–49 (Ben. Rev. Bd. 1991) (emphasis supplied). "The liability based upon the irrebuttable presumption fell upon the operator as of [the date the disease was established] and the obligations of the operator are to be discharged by the carrier as of that date." *Id.*; *see also* 20 C.F.R. § 725.503(b) ("Benefits are payable to a miner who is entitled beginning with the month of onset of total disability due to pneumoconiosis arising out of coal mine employment.").

2.

*Dr. Shrader's Testimony*

BrickStreet points to Dr. Shrader's deposition testimony as establishing an onset date of complicated pneumoconiosis before January 2013. At his March 26, 2015 deposition, Dr. Shrader testified that his diagnosis of Claimant's pneumoconiosis was based, in part, on his review of an x-ray report from 2007. According to Dr. Shrader, that report reflected large bilateral opacities in Claimant's lungs. Dr. Shrader also reviewed several of the x-ray reports conducted for this case, including the 2012 x-ray interpreted by Dr. DePonte, and noted that all of the x-ray reports included "[t]ypical findings of

complicated coal worker's pneumoconiosis, bilateral large opacities." J.A. 96–97. Based upon his review of the x-ray interpretations, Dr. Shrader concluded that the masses in Claimant's chest "were present in the chest x-ray in '07" and agreed that Claimant "would . . . have had complicated pneumoconiosis or progressive massive fibrosis in his lungs by October or November of 2012." *Id.* at 97.

However, this testimony is insufficient to establish complicated pneumoconiosis under the regulations. Neither the 2007 x-ray upon which Dr. Shrader relied nor details about the x-ray or its interpretation were submitted into evidence. *See* 20 C.F.R. § 718.102(h) ("[N]o chest X-ray may constitute evidence of the presence or absence of pneumoconiosis unless it is conducted and reported in accordance with the requirements of this section and Appendix A."); *id.* § 718.102(a) (a chest x-ray "must be of suitable quality for proper classification of pneumoconiosis and must conform to the standards for administration and interpretation of chest X-rays"); *id.* § 718.102(c) ("Digital images derived from film screen chest X-rays (e.g., by scanning or digital photography)" are not "suitable quality for proper classification of pneumoconiosis").

Additionally, Dr. Shrader's testimony, like his 2012 note, establishes only that as of 2007 Claimant had markers of clinical pneumoconiosis. But while the presence of "extensive diffuse reticulonodular interstitial opacities," J.A. 95, may be sufficient for a doctor to diagnose clinical pneumoconiosis, it is not sufficient to establish that Claimant suffered from legal complicated pneumoconiosis because it lacks any details as to the size or classification of the opacities. *See* 20 C.F.R. § 718.304(a) (for irrebuttable presumption to attach, claimant must be "suffering . . . from a chronic dust disease of the

33

lung which . . . [w]hen diagnosed by a chest X-ray . . . yields one or more large opacities (greater than one centimeter in diameter) and would be classified in Category A, B, or C" under the International Labor Organization classification guidelines); *see also E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs*, 220 F.3d 250, 257 (4th Cir. 2000) ("Because of the possibility -- even likelihood -- of divergence between medical and legal standards in the context of the [Act], we have counseled that one must evaluate the evidence with a sensitivity to conflicting meanings ascribed to the same words by lawyers and doctors." (alteration and internal quotation marks omitted)).

Dr. Shrader speculated that, because complicated pneumoconiosis does not simply appear overnight, Claimant must have suffered from the disease long before its diagnosis in January 2013. This is not an earth-shattering position. The regulations have long recognized that pneumoconiosis is "a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure." 20 C.F.R. § 718.201(c). But, without any *evidence* as to the size or classification of the opacities reflected on the x-ray, it would be impossible to conclusively determine when Claimant's simple pneumoconiosis developed into complicated pneumoconiosis so as to trigger the presumption of total disability. Mere speculation will not suffice. An "ALJ has . . . the affirmative duty to qualify evidence as reliable, probative, and substantial before relying upon it to grant or deny a claim. Absent such a discipline to qualify evidence, administrative findings and orders could unacceptably rest on suspicions, surmise, and speculation." *U.S. Steel Mining Co. v. Dir., Office of Workers' Comp. Programs*, 187 F.3d 384, 389 (4th Cir. 1999) (citations and internal quotation marks omitted). Here, the

34

ALJ had no way to ensure that Dr. Shrader's testimony was "reliable, probative, and substantial" so that the decision would not rest upon "suspicions, surmise, and speculation." *Id.* The ALJ was well within his discretion to give little weight to -- or even disregard -- Dr. Shrader's testimony. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 532 n.9 (4th Cir. 1998) ("An ALJ has discretion to disregard an opinion unsupported by a sufficient rationale.").

Thus, even if Dr. Shrader's deposition was wrongfully excluded, the ALJ's decision that Dr. Shrader's testimony could not impact the onset date of complicated pneumoconiosis was both in accordance with the law and supported by substantial evidence.

IV.

For these reasons, the judgment of the Benefits Review Board is

*AFFIRMED*.